# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

AMANDA ELLSWORTH,　　　　　　　)
BRAEDEN WALLING,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　Case No. 19-CV-34-TCK-FHM
　　　　　　　　　　　　　　　　　)
CITY OF BROKEN ARROW,　　　　　 )
OKLAHOMA, a municipal corporation,)
JOSHUA ZOLLER, Individually,　　　 )
RODNEY GARNER, Individually,　　　)
　　　　　　　　　　　　　　　　　)
　　　　Defendants,

## OPINION AND ORDER

Before the Court are the following Motions for Summary Judgment:

- Plaintiffs' Motion for Summary Judgment against defendants Joshua Zoller, Rodney Garner and the City of Broken Arrow. Doc. 59.

- Defendant Rodney Garner's Motion for Summary Judgment against plaintiffs. Doc. 60.

- Defendant Joshua Zoller's Motion for Summary Judgment against plaintiffs. Doc. 61.

- Defendant City of Broken Arrow, Oklahoma's Motion for Summary Judgment against plaintiffs. Doc. 62.

**I. INTRODUCTION**

This lawsuit arises from an August 1, 2018 traffic stop conducted by Broken Arrow Police Department ("BAPD") officers after BAPD dispatch advised them that the Tulsa Police Department ("TPD") was pursuing a vehicle involved in an armed robbery in Tulsa. BAPD officers were informed that there were two handguns in the vehicle and a TPD helicopter was following it. BAPD officer Joshua Zoller ("Zoller") reported he was behind a black car that appeared to fit the description, and asked for confirmation that it was the suspect vehicle. TPD directly responded to him over the radio, telling him, "Yeah, you're behind the car."

Zoller and BAPD officer Rodney Garner ("Garner") initiated a felony stop, directing first the driver and then front seat passenger to exit the car.[1] The driver, Amanda Ellsworth ("Ellsworth"), was handcuffed and placed in one of the police cars. While the front seat passenger, Braeden Walling ("Walling"), was exiting the vehicle, TPD radioed to BAPD Officers, advising that Ellsworth and Walling were not the suspects TPD was trying to find. The officers removed Ellsworth's handcuffs and released both plaintiffs.

Plaintiffs filed this action in Tulsa County District Court, and the case was removed to this Court pursuant to 28 U.S.C. § 1446.

In their Amended Complaint, plaintiffs assert the following claims:

1. False arrest in violation of 42 U.S.C. § 1983 against the City of Broken Arrow;

2. Use of excessive force in violation of 42 U.S.C. § 1983 against the City of Broken Arrow ("City");

3. False arrest in violation of Oklahoma state law against the City of Broken Arrow, Marque Baldwin and Broken Arrow Police Officers 1-10;[2]

4. Assault and battery in violation of Oklahoma state law against the City of Broken Arrow, Marque Baldwin and Broken Arrow Police Officers 1-10.

Doc. 11.

All parties have filed motions for summary judgment in their favor on all claims. Docs. 59-62.

---

[1] Three younger children were in the back seat of the car. Doc. 76, Ex. 8, Walling Dep. at 111:25-13:25.

[2] The only BAPD officers remaining in the lawsuit at this time are Officers Zoller and Garner.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party opposing a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

A movant that "will not bear the burden of persuasion at trial need not negate the nonmovant's claim, "but may "simply . . . point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal citations omitted). If the movant makes this prima facie showing, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial. The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing

presentation by the moving party." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (internal citations omitted).

## III. MATERIAL FACTS

### A. City of Broken Arrow Policies and Procedures

The City of Broken Arrow has official policies and procedures governing Use of Force, Traffic Enforcement, Search and Seizures, and Use of Deadly Force. Doc. 62, Exs. 5-8.

The Use of Force policy states that all BAPD employees "utilize the minimum amount of force necessary in the control and apprehension and states, "Utilization of force must be objectively reasonable under Graham v. Conner Standards." *Id.*, Ex. 5.

The Traffic Enforcement policy states that "[t]raffic stops aid enforcement not only in traffic law violations but also in safety concerns, suspicious activity, and other criminal conduct." *Id.*, Ex. 6. Further, it provides that "[w]hen conducting a traffic stop, officers shall attempt to conduct the stop in a manner and location that provides a safe environment for the officer and violator." *Id.* Additionally, the policy states, "Officers shall always be aware of the dangers associated with traffic stops, follow current training tactics and techniques, maintain a safe position, and keep good observation of violator and surrounds." *Id.*

The Search and Seizure policy provides, in pertinent part, "All warrantless searches and arrests will be conducted according to guidelines established by the United States Supreme Court and the laws of this State." *Id.*, Ex. 7. Searches of a person must be "reasonable" under the circumstances and officers must be able to articulate specific reasons leading up to and surrounding the search. *Id.*

The Use of Deadly Force policy states that "[e]mployees shall only use that degree of force which is reasonable and necessary under the circumstances presented," and "[a]n employee may

4

use deadly force within the guidelines of this policy when all reasonable alternatives appear impracticable and the employee believes the use of deadly force is a necessary last resort." *Id.*, Ex. 8.

### B. BAPD Officer Training

The City of Broken Arrow trains its officers in search and seizure, investigative detentions, and probable cause. Doc. 62, Ex. 11, City of Broken Arrow Resp. to Disc., at Resp. to Int. No. 1.

According to Grep Sipes, the Captain of BAPD training, on duty police officers receive information from headquarters by both radio and Computer Aided Dispatch ("CAD"), which is transmitted to the officers' laptops. Doc. 82, Ex. 2, Sipes Dep. at 78:18-79:9. Captain Sipes testified that while officers are generally expected to rely on information on the CAD program on their laptops, they should not do so when they are actively following a car because "it's very dangerous to follow a vehicle in moving traffic and try to read a computer screen." *Id.* at 79:22-80:7.

Captain Sipes described the stop at issue as a "high-risk traffic stop," and testified that in a high-risk traffic stop, "we teach our officers to get their firearms out and point it at the threat area until they know that the scene has been rendered safe." *Id.* at 75:13-76:9. He also confirmed that, depending on circumstances, when police "come upon a scene where they think . . . a crime occurred, and they've got a bunch of people there that they don't know what they've done. . . they can handcuff them first and sort the facts out later." *Id.* at 38:9-16.

### C. The August 1, 2018 Traffic Stop

On August 1, 2018 at 19:12:58, BAPD Dispatch radioed to BAPD officers for backer assistance. Doc. 62, Ex. 1, Transcript of BAPD Dispatch Call at 1; Doc. 82, Ex. 1, CD of BAPD Dispatch Call. At 19:13:07 p.m., BAPD Dispatch advised BAPD Officers Zoller, Garner and

5

Marque Baldwin and Sergeant Bryan Bandy that "Tulsa is in pursuit of a vehicle, black Ford Mustang that was involved in an armed robbery in their city." *Id.* At 19:13:51 p.m., after confirming the subject vehicle's location with TPD, BAPD Dispatch radioed BAPD officers stating, "Kenosha and Aspen southbound *Tulsa helicopter is following it*." *Id.*, emphasis added.

By 19:14:16 p.m., Officers Garner, Zoller, and Baldwin and Sergeant Bandy had all confirmed they were driving toward the location of the vehicle being followed by TPD. Doc. 62, Ex. 1 at 1-2. At 19:14:30 p.m., BAPD Dispatch advised the officers, "the armed robbery involved a gun." *Id.* At 19:14:56 p.m., BAPD Dispatch radioed the BAPD Officers, stating there were "no TPD units on [the vehicle] besides the helicopter, just the helicopter following." *Id.* For approximately the next 30 seconds, BAPD Dispatch provided updates on the location of the subject vehicle. *Id.*

At 19:15:45 p.m., Officer Baldwin stated over the radio, "There's [a] black vehicle that just passed me in front of the . . . the market and . . . the gym on south Aspen." *Id.* At 19:15:53 p.m., Officer Zoller replied to Officer Baldwin over the radio, stating, "Yeah, that looks like Mustang, Marque," and Officer Baldwin stated, "Looks more like a . . . Charger." *Id.*

At 19:15:56 p.m., BAPD Dispatch advised the officers, "There are two handguns in the vehicle per Tulsa." *Id.* At 19:16:15 p.m., Officer Zoller asked BAPD Dispatch if it had been provided a tag number of the suspect vehicle, and Dispatch responded that no tag number had been provided. *Id.* At 19:16:26 p.m., Officer Zoller told BAPD Dispatch, "Ask the helicopter if we're behind it." *Id.* Additionally, he called out the license plate number of the vehicle over the radio. *Id.* At 19:16:50 p.m., Officer Zoller stated over the radio, "OK, we [a]re stopped at Washington behind a black car. *Ask him if we're behind the car*." *Id.* (emphasis added). The TPD helicopter

replied directly to Officer Zoller at 19:16:56 p.m., stating, "Police Police 2 we're over here with you now, *uh yeah you're behind the car.*" *Id.* (emphasis added).

Officers Zoller and Garner were never advised to whom the vehicle involved in the Tulsa armed robbery was registered. Doc. 82, Ex. 1, CD of Dispatch Call, Ex. 4, Dispatch Call Transcript. Neither the CAD nor the radio transmissions to Officers Zoller and Garner stated that the suspects TPD was pursuing were the owners of the vehicle involved in the armed robbery. *Id.*, Ex. 1; Ex. 4, Sheeba Atiqi Affid.; Ex. 5, CAD Call Information. Although the CAD Call Information on the officers' laptop computers indicated at 7:19:14:27 that one of the suspects was possibly a Hispanic male, neither Zoller nor Garner had their laptops open because they were driving and were therefore relying on BAP Dispatch radio communications. Doc. 62, Ex. 2, Zoller Dep. at 32:2-5; Doc. 82, Ex. 3, Garner Dep. at 29:15-30:6.[3] Moreover, before the stop was initiated, the radio transmissions never advised that either the driver or the front passenger of plaintiffs' vehicle were Hispanic males. Doc. 68, Ex. 4, 5.

Furthermore, neither the CAD nor the radio transmission stated that TPD was "searching" for a black Ford Mustang before the stop began. Doc. 82, Exs. 4, 5. Instead, BAPD Dispatch specifically advised via both CAD and radio call, "Tulsa helicopter is *following* it." *Id.*, Ex.1; Ex. 4 at 19:13:51 (emphasis added); Ex. 5 at 19:13:06 (emphasis added).

At 19:17:03 p.m., Officer Zoller called out over the radio that BAPD Officers were "gonna try a felony stop here at Aspen and Boston." Doc. 82, Ex. 1, Ex. 4. Officer Zoller turned on his lights to pull Plaintiffs' vehicle over. Doc. 62, Ex. 2, Zoller Dep. at 108:2-15. Plaintiffs' vehicle

---

[3] The Captain of the BAPD Training, Greg Sipes, testified that while officers are generally expected to rely on information on the CAD program on their laptops, they should not do so when they are actively following a car because "it's very dangerous to follow a vehicle in moving traffic and try to read a computer screen." Doc. 82, Ex. 2, Sipes Dep. at 79:22-80:7.

7

drove for about a half mile before pulling over to the curb and coming to a stop. *Id.* at 108:16-21. Officer Garner, Officer Baldwin and Sergeant Bandy pulled up behind Officer Zoller. Doc. 62, Ex. 3, Garner Dep. at 54: 9-55:7. Officer Zoller radioed the tag number of the vehicle, then exited his vehicle, drew his firearm and pointed it at Plaintiffs' vehicle. *Id.* at 55:16-19.[4] Officer Garner exited his vehicle, went to the passenger side of Officer Zoller's car, and pointed his rifle at the back of Plaintiffs' vehicle. Doc. 62, Ex. 3 at 44:1-14.

Officer Zoller issued verbal commands to the driver, Plaintiff Ellsworth, "to exit the vehicle, to turn around and walk backwards." Doc. 62, Ex. 2 at 61:14-18. Once Ellsworth exited her vehicle, Officer Garner put his rifle in the passenger seat of Officer Zoller's car, walked around the back of it, and waited for Ellsworth to walk back to him to be placed in handcuffs. Ex. 3 at 49:16-50:3. Officer Zoller testified that when Ellsworth got close to the front of his car, he and Officer Garner "had her go down to her knees and put her hands behind her back," and "[a]t that time, Officer Garner placed handcuffs on her and took her out of [Zoller's] line of sight." Ex. 2 at 61:18-22. Ellsworth testified that Officer Garner told her to get down on her knees, but then "he grabbed my arm and he slams me to my knees," and then "threw" her in the back seat of Officer Zoller's car. Doc 82, Ex. 6, Ellsworth Dep. at 35:5-7-36:11-13. She testified that she suffered bruises on her ankle and left arm from being forced down. *Id*. at 35:5-25. Garner denies that he put Ellsworth on the curb first, and testified that he put her in the back seat of his police car, which was located behind Officer Zoller's car. Doc. 62, Ex. 3, Garner Dep. at 53:20-54:18.[5]

---

[4] Captain Sipes testified in a high-risk traffic stop such as the one at issue here, "we teach our officers to get their firearms out and point it at the threat area until they know that the scene has been rendered safe." Doc. 82, Ex. 2, Sipes Dep. at 75:13-76:9.

[5] For purposes of the pending motions, the Court accepts as true Ellsworth's allegations about being forced down and placed in the police car.

8

Officer Zoller testified that he then turned his attention back to Plaintiffs' vehicle, and continued to point his gun at the middle of the back windshield. *Id.*, Ex. 2 at 61:24-25; 66:4-7. After Officer Garner escorted Ellsworth to his car, Officer Zoller commanded the front seat passenger, Plaintiff Walling, "to exit the vehicle, place [her] hands in the air and start walking backwards to the sound of [Zoller's] voice. *Id.*, Ex. 2, Zoller Dep. at 62:22-63:3; Ex. 3, Ellsworth Dep. at 61:5-10. Plaintiff Walling exited the vehicle facing the BAPD Officers, and Zoller had her turn herself away from his voice. *Id.*, Ex. 2 at 88:14-22.

Officer Garner testified that Plaintiff Walling had reached midway to him when TPD radioed that the Plaintiffs were not their suspects. *Id.*, Ex. 3 at 63:2-11.[6] The officers holstered their guns. Ex. 2, Zoller Dep. at 64:16. TPD's transmission telling BAPD Officers that Plaintiffs were not the suspects TPD was looking for occurred at 19:21:08 p.m. Doc. 62, Ex. 1 at 4. Thereafter, Plaintiff Ellsworth was un-cuffed and the detention was ended. Doc. 61, Ex. 2 at 64:18-66:3; Doc. 82, Ex. 6, Ellsworth Dep. at 42:21-25; Ex. 7, Zoller Dep. at 56:1-13. At the time TPD advised Officers Zoller and Garner that Plaintiffs were not the suspects, the Officers had not completely cleared the car. *Id.*, Ex. 6, Ellsworth Dep. at 42:21-25; Ex. 7, Zoller Dep. at 56:1-13. The time elapsed between when Officer Zoller stated that he was going to attempt a stop and the end of the detention was approximately four minutes (19:17:03 initiation of stop; 19:21:08 cessation of stop).

Office Zoller testified—and the recording and transcript of the BAPD dispatch call confirm—that at the time he initiated the traffic stop, he was unaware the two suspects the TPD

---

[6] Officers Zoller and Garner both testified that Walling was never handcuffed. Doc. 62, Ex. 2, at 89:11-23; Ex. 3, Garner Dep., Ex. 3 at 68:19-20. However, Walling testified that she *was* handcuffed. Doc. 76, Ex. 8, Walling Dep. at 13:12-14:3. For purposes of the pending summary judgment motions only, the Court assumes Walling was handcuffed.

helicopter was pursuing were Hispanic males. Doc. 82, Ex. 7, Zoller Dep. at 117:13-18; Doc. 62, Ex. 1; Doc. 82, Ex. 1. Further, he stated that even had he received this information, the fact that the front seat passengers were not Hispanic males would not have convinced him the stop shouldn't have been conducted because "there could be people hiding in there that I can't see. I mean, one of the occupants could've been a Hispanic male. I could not tell who the occupants were when I made the stop." Doc. *Id.* at 117:24-118:10.

## IV. ANALYSIS

### A. Federal Claims for False Arrest and Use of Excessive Force

Plaintiffs assert claims against the City, Officer Zoller and Officer Garner for false arrest and use of excessive force in violation of 42 U.S.C. §1983. Both of the Plaintiffs and all three defendants seek summary judgment as to all claims.

#### 1. False Arrest

Plaintiffs assert that the traffic stop conducted by Officers Zoller and Garner was an illegal seizure. The City and police officers contend the stop was supported by reasonable suspicion and was conducted using constitutional procedures.

A traffic stop for a suspected violation of law is a "seizure" of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255-259 (2007). Law enforcement officers may temporarily detain a person for questioning or investigation where they have a reasonable and articulable suspicion that criminal activity may be afoot. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The level of suspicion required for a "reasonable suspicion" is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The fact that the detainees actually committed no crime is immaterial to the seizure analysis. "[O]fficers are entitled

to rely on . . . reasonably trustworthy information provided to them by the dispatcher, even though the information was later determined to be faulty or inadequate." *Miller v. City of Nichols Hills Police Dept.*, 42 Fed. Appx. 212, 216 (10th Cir. 2002) (unpublished), citing *United States v. Hensly*, 469 U.S. 221, 231 (1985) (holding officers are entitled to rely on reasonable information from police dispatcher and it is immaterial that the dispatcher's information is later determined to be faulty or inadequate).

A non-arrest seizure is valid if supported by a "particularized and objective basis for suspecting the particular person stopped of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). "Under *Terry's* strictures, the police may initiate a traffic stop if they have reasonable suspicion that criminal activity is, has or is about to occur." *United States v. Copening*, 506 F.3d 1241, 1246 (10th Cir. 2007). Furthermore, pursuant to the "fellow-officer rule," police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid [had properly determined the existence of] probable cause. *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1180 (10th Cir. 2003) (citing *Whiteley v. Warden*, 502 U.S. 560, 568 (1971)).

"While *Terry* stops generally must be fairly nonintrusive, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures." *U.S. v. Perdue*, 8 F.3d 1445, 1462. (10th Cir. 1993). Accordingly, "the use of guns in connection with a stop is permissible where the police reasonably believe [the weapons] are necessary for their protection." *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982), *cert. denied,* 461 U.S. 916 (1983). Nor do officers have to be certain a person is armed before pointing their firearms and using handcuffs to render an entire scene safe before asking questions. *Perdue*, 8 F.3d at 1455.

Moreover, "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection." *Id.* (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

The undisputed facts of this case establish that the traffic stop and search were supported by a reasonable suspicion that the occupants of the vehicle had been involved in criminal activity. Specifically:

- Although the CAD Call Information indicates a communication that one of the suspects was a Hispanic male, the officers—because they were driving—were relying on BAPD dispatch radio communications, and they did not learn the suspects were Hispanic males until after the stop and detention of plaintiffs.

- Officers Garner and Zoller were told by BAPD radio that the vehicle TPD was following had been involved in an armed robbery in Tulsa, and that the suspects had two handguns.

- BAPD dispatch initially stated that TPD was pursuing a black Ford Mustang. However, after Officer Zoller said the vehicle he was following was a Dodge Charger, called out its license plate number and requested confirmation that he was behind the vehicle TPD was following, the TPD helicopter itself confirmed to him that the vehicle he was following was the vehicle that should be pulled over.

- After the officers were informed by BAPD dispatch radio that the suspects were two Hispanic males, the Plaintiffs were released and the search of the car was suspended.

It is well settled that officers are entitled to rely on "reasonably trustworthy information provided to them by the dispatcher, even though the information [is] later determined to be faulty or inadequate." *Miller v. City of Nichols Hills Police Dept.*, 42 Fed. Appx. 212, 216 (10th Cir. 2002) (unpublished) (citing *United States v. Hensley*, 469 469 U.S. 221, 231 (1985) (holding that police officers are entitled to rely on the reasonable information relayed to them from a police bulletin); *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (holding officers are entitled

to rely on reasonable information relayed from police dispatcher and it is immaterial that dispatcher's information is later determined to be faulty or inadequate).

Accordingly, the Court concludes that the City, Officer Zoller and Officer Garner are entitled to summary judgment in their favor on Plaintiffs' Fourth Amendment claims for false arrest.

### 2. Excessive Force Claims

Both plaintiffs assert claims against the City and Officers Zoller and Garner for use of excessive force. Ellsworth's claim is based on the fact that the officers drew their weapons during the stop, on her allegation that Officer Garner forced her to her knees, and on the fact that she was handcuffed. Walling's excessive force claim is based on the officers' drawing their weapons during the stop and on her alleged handcuffing.

In *Windom*, the Tenth Circuit stated, "[W]e have held that 'the governmental interest in the safety of officers *outweighs* the individual's Fourth Amendment interest when an officer has an objective basis to believe that the person being lawfully detained is armed and dangerous.'" 863 F.3d at 1331 (emphasis in original) (quoting *United States v. King*, 990 F.2d 1552, 1561 (10th Cir. 1993). "Indeed, when an officer has a reasonable belief that a suspect he is investigating at close range is armed, 'it would appear to be clearly *unreasonable* to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon to neutralize the threat of physical harm." *Id.* (emphasis in original) (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)).

The Tenth Circuit has "upheld police officers' use of handcuffs and guns during a *Terry* stop where they 'reasonably believe' such measures are necessary to ensure officer safety." *United States v. Copening*, 506 F.3d 1241, 1248 (10th Cir. 2007) (citing *United States v. Neff*, 300 F.3d

13

1217, 1220 (10th Cir. 2002) and *United States v. Shareef*, 100 F.3d 1491, 1495 (10th Cir. 1996)).

"In evaluating whether the precautionary steps taken by an officer [during a stop] were reasonable, the standard is objective—would the facts available to the officer at the *moment of the seizure* warrant a man of reasonable caution in the belief that the action taken was appropriate." *United States v. Mosley,* 743 F.3d 1317, at 1328-29) (10th Cir. 20140) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).

Here, at the moment of the seizure, Officers Zoller and Garner believed, based on the BAPD dispatch call and communications from the TPD helicopter that:

- notwithstanding TPD's earlier statement that they were pursuing a black Ford Mustang, the TPD helicopter had confirmed to Officer Zoller that the vehicle BAPD officers were following (which was a black Dodge Charger) was the vehicle TPD wanted to be pulled over;

- there were two handguns in the car; and

- the vehicle was fleeing from the scene of an armed robbery.

Accordingly, the Court concludes that the officers acted reasonably in stopping the car, training weapons on it and ordering plaintiffs to show their hands.

After the occupants of the front seat complied with the officer's command to show their hands out the front windows, the officers could see that they were not holding guns. However, they could not tell whether either had weapons on their person, nor could they see into the car to determine whether there were guns and/or more occupants in it. *See Marilyn v. Wilson*, 519 U.S. 408, 414 (1997) (holding that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car"); *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (officers pointing a gun at suspects during a *Terry* stop did not elevate a seizure into an arrest given, *inter alia*, that the officers reasonably believed the individuals to be armed and dangerous). Furthermore, although Officer Garner denies having pushed Ellsworth to

14

her knees, the Tenth Circuit has long held that police officers, when executing a felony stop, may be permitted to force a detainee to the ground. *Windom*, 863 F.3d at 1329-30; *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007); *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993).

Finally, when the officers received information from TPD that plaintiffs were not the suspects TPD was seeking, they promptly terminated the stop and released Plaintiffs.

Accordingly, the Court concludes that the City, Officer Zoller and Officer Garner are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claims for use of excessive force.

### B. State Law Claims

The City of Broken Arrow and the police officers have also filed motions for summary judgment in their favor on Plaintiffs' state law claims for false arrest and use of excessive force.

#### 1. False Arrest

Under Oklahoma law, "false arrest" is "an unlawful restraint of an individual's personal liberty or freedom of locomotion" or "an arrest without proper legal authority." *Shaw v. City of Oklahoma City*, 380 P.3d 894, 399 (Okla. Civ. App. 2016) 380 P.3d 894, 899 (Okla. Civ. App. 2016). The undisputed facts recited in the Court's analysis of Plaintiffs' § 1983 claim for false arrest support a conclusion that the temporary detention of Ellsworth and Walling was neither an unlawful restraint of their personal liberty or locomotion nor an arrest without proper legal authority.

### 2. Assault and Battery

Under Oklahoma law, "any willful and *unlawful* attempts to offer with force or violence to do a corporal hurt to another." Okla. Stat. tit 21, § 641 (emphasis added). The Oklahoma Supreme Court has stated:

> [A] police officer does not stand in the same shoes as an ordinary citizen when it comes to using force against another person which exposes that person to a risk of injury. This much stands clearly recognized in the state's criminal law. In making a lawful arrest, a police officer is statutorily relieved of *criminal liability* for *assault and battery* as long as the act of force is "necessarily committed by the officer in the performance of a legal duty." At the same time, an officer is "subject to the criminal laws of this state to the same degree as any other citizen" if *excessive force* is used. Excessive force is statutorily defined as "physical force which exceeds the degree of physical force permitted by law or the policies and guidelines of the law enforcement entity."

*Morales v. City of Oklahoma City*, 230 P.3d 869, 879 (Okla. 2010) (emphasis in original).

It is undisputed that Officer Zoller never touched either Plaintiff, and there is no evidence that Officer Garner touched Walling. Moreover, although Plaintiff Ellsworth claims Officer Garner pushed her to her knees before handcuffing her, the Court's determination that Garner did not use excessive force is dispositive of Ellsworth's state law claim for excessive force.

### V. CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment against defendants Zoller, Garner and the City of Broken Arrow, Oklahoma (Doc. 59) is denied. The Defendants' Motions for Summary Judgment against plaintiffs Ellsworth and Walling (Docs. 60, 61 and 62) are granted.

ENTERED this 11th day of March, 2020.

TERENCE C. KERN
United States District Judge